UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff/Respondent, | ) | No. 2:13-CR-8-ART-REW |
| | ) | No. 2:14-CV-7384-ART-REW |
| v. | ) | |
| | ) | |
| CLIFFORD WATSON, | ) | RECOMMENDED DISPOSITION |
| | ) | |
| Defendant/Movant. | ) | |

*** *** *** ***

Movant, Clifford Watson, is a federal inmate. DE #1283 (Motion), at 1. On December 2, 2014,[1] Watson filed a *pro se*[2] motion, accompanied by a declaration and an attachment, under 28 U.S.C. § 2255. *See generally id.* After two extensions of time, DE ##1289, 1303 (Orders), Movant filed a supplemental memorandum in support of the motion. DE #1327 (Memorandum of Law). The United States responded in opposition on March 7, 2015. DE #1331 (Response). After an extension of time, DE #1354 (Order), Movant replied. DE #1372 (Reply). On the United States's motion, the Court found that, as to communications necessary to litigate the claims of ineffective assistance, Watson waived attorney-client privilege. DE #1297 (Order). Per normal practice, the District assigned the matter to the undersigned for a recommended disposition. The Court

[1] This filing date reflects the prison mailbox rule. *See Richard v. Ray*, 290 F.3d 810, 812-13 (6th Cir. 2002) (*per curiam*). Here, Watson affirmed under penalty of perjury that he executed the motion on December 1, 2014, and mailed it, per prison mail, on December 2, 2014. DE ##1283, at 13.

[2] *Pro se* petitions receive a comparatively lenient construction by the Court. *Franklin v. Rose*, 765 F.2d 82, 84-85 (6th Cir. 1985) (noting that "allegations of a *pro se* habeas petition, though vague and conclusory, are entitled to a liberal construction" including "active interpretation" toward encompassing "any allegation stating federal relief" (citations and internal quotation marks omitted)).

**RECOMMENDS** that the District Judge fully **DENY** § 2255 relief and issue **NO** Certificate of Appealability.

## I. BACKGROUND INFORMATION

On April 11, 2013, a grand jury indicted Watson on one count of conspiring to knowingly and intentionally distribute oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. § 846. DE #364 (Superseding Indictment). Watson pleaded guilty, pursuant to a plea agreement, on July 18, 2013. DE ##755 (Rearraignment Minute Entry); 756 (Plea Agreement); 757 (Sealed Supplement). Judge Thapar sentenced Watson on November 20, 2013. DE #997 (Sentencing Minute Entry). Movant received a 46-month prison term followed by 10 years of supervised release (with the possibility of early termination after 5 successful years). DE #998 (Judgment). Watson did not appeal. On December 2, 2014, Watson timely submitted his § 2255 motion to vacate, DE #1283, and later a supplemental memorandum, DE #1327. The Government responded. DE #1331. Watson replied. DE #1372. The motion stands ripe for review. The Court wholly rejects Movant's ineffective assistance of counsel claims (and possible due process claim), and recommends dismissal.

## II. STANDARD OF REVIEW

Under 28 U.S.C. § 2255, a federal prisoner may obtain post-conviction relief if his sentence violates the Constitution or federal law, the federal court lacked jurisdiction to impose such sentence, or the sentence exceeds the maximum authorized by law. 28 U.S.C. § 2255(a); *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003) ("In order to prevail upon a § 2255 motion, the movant must allege as a basis for relief: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits;

or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" (quoting *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001))). A defendant alleging a constitutional basis must establish "an error of constitutional magnitude" and show that the error had a "substantial and injurious effect or influence on the proceedings" in order to obtain § 2255 relief. *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999) (citing *Brecht v. Abrahamson*, 113 S. Ct. 1710, 1721-22 (1993)). When alleging a non-constitutional error, a defendant must prove that the error constituted a "'fundamental defect which inherently results in a complete miscarriage of justice,' or, an error so egregious that it amounts to a violation of due process." *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (quoting *Hill v. United States*, 82 S. Ct. 468, 471 (1968)); *see also Watson*, 165 F.3d at 488. In making a § 2255 motion, a movant generally bears the burden of proving factual assertions by a preponderance of the evidence. *McQueen v. United States*, 58 F. App'x 73, 76 (6th Cir. 2003) (*per curiam*) ("Defendants seeking to set aside their sentences pursuant to 28 U.S.C. § 2255 have the burden of sustaining their contentions by a preponderance of the evidence.").

## III. ANALYSIS

In his § 2255 motion, Watson requests relief based on various allegations or formulations of ineffective assistance of counsel (and possibly a due process claim). He justifies no relief under 28 U.S.C. § 2255.

### *A. Ineffective Assistance of Counsel*

When asserting an ineffective assistance claim, a movant must prove both deficient performance and prejudice. *Strickland v. Washington*, 104 S. Ct. 2052, 2064 (1984); *Campbell v. Bradshaw*, 674 F.3d 578, 586 (6th Cir. 2012); *Pough v. United*

*States*, 442 F.3d 959, 964 (6th Cir. 2006) (noting that a movant must prove ineffective assistance by a preponderance of the evidence). In order to prove deficient performance, a movant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 104 S. Ct. at 2064. A movant meets this burden by showing "that counsel's representation fell below an objective standard of reasonableness" as measured under "prevailing professional norms" and evaluated "considering all the circumstances." *Id.* at 2064-65. Judicial scrutiny of counsel's performance, however, is "highly deferential," featuring a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 2065.

Deficient performance is considered constitutionally prejudicial only when "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 2064. In order to prove prejudice, a movant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 2068. When evaluating prejudice, courts generally must take into consideration the "totality of the evidence before the judge or jury." *Id.* at 2069. "In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice." *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012).[3] In the sentencing context, ineffective assistance "can result in *Strickland* prejudice because any amount of additional jail time has Sixth Amendment significance." *Id.* at 1386 (internal quotation marks, alteration, and citation omitted).

---

[3] *Lafler* was a § 2254 case, but the analysis also applies to a § 2255 *Strickland* theory. *See Winkler v. United States*, Nos. 3:08-cr-014, 3:10-cv-210, 2013 WL 4494971, at *2 (E.D. Tenn. Aug. 20, 2013) (A § 2254 case's "reasoning, nevertheless, applies to cases filed by federal prisoners under 28 U.S.C. § 2255 because §§ 2254 and 2255 are counterparts of each other and the law applicable to one generally applies to the other.").

1. Failing to Provide Watson with Discovery

Watson first argues that his appointed attorney, Hon. Robert L. Abell, was ineffective because he "[d]id not ensure that [Watson] obtained complete discovery, and did not review the partial discovery with [him]." DE #1327, at 7; *see also* DE #1283, at 5. Watson (minimally) elaborates that "[b]ecause [he] did not get complete discovery [and] because he could not discuss discovery that he didn't get with his atto[r]ney, he could not demonstrate either his complete[] or partial[] defense to the offense." DE #1327, at 7; *see also id.* at 9 (further explicating this argument). The argument solely relates to discovery provided by Mr. Abell to Watson; Movant does not allege constitutional deficiencies in the United States's production.

Watson's conclusory, unsubstantiated argument plainly fails both *Strickland* prongs. First, as the United States notes, the Court instituted various protective and clarifying orders for particular discovery in the case—an unusually complex, 40-defendant conspiracy prosecution—which prevented Mr. Abell from providing all discovery materials to Defendant personally. *See* DE ##239, 302, 475. DE #475 is particularly instructive. Judge Smith ordered that "as to the materials covered by the protective orders, [co-Defendant Kilburn] is not permitted to receive and possess copies of those materials, nor are any of the Defendants." DE #475, at 2. Defense counsel could, however, review these protected documents in person with the defendants. *Id.* Judge Smith then established a process to provide "the detained Defendants with supervised or secured access to a set of the protected discovery materials maintained at the detention facility." *Id.* The Court provided the custodial facility with three laptops loaded with discovery for the defendants' use. *Id.* at 4-5. Each of these documents predated Watson's

actual entry to the case, but they provided general case operating procedures that continued to apply when additional defendants joined.[4]

Mr. Abell, detailing his role in the case by affidavit, stated that he "received substantial discovery materials" from the United States, including "10 CDs/DVDs[,]" which he "reviewed" and mined for documents "that made reference to Mr. Watson." DE #1331-1 (Abell Affidavit), at 6. These applicable materials totaled 789 pages. *Id.* Of this voluminous whole, Mr. Abell sent Watson 7 particular sets of material, as well as, subsequently, records from a Pennsylvania pharmacy. *Id.* Mr. Abell had a 1.7 hour meeting with Watson "devoted to discussing the apparent evidence and what the government would likely do to prove the conspiracy" on June 20, 2013. *Id.* Watson thus had in hand all documents relating to him except those restricted by order. As to that set, he had electronic access at the jail.

Watson does not establish that Mr. Abell deficiently performed, given the Court orders regulating discovery access. He further in no way explains or shows "how the absence of the discovery materials affected his decision to plead guilty." *Hamilton v. Romanowski*, No. 5:10-CV-14392, 2012 WL 2224450, at *10 (E.D. Mich. May 7, 2012) (finding that "petitioner has failed to satisfy the prejudice prong of the *Strickland* test" as to a similar failure to provide discovery claim). Even assuming Watson satisfies prong 1, he certainly makes no showing that the outcome of his case would have been different if he had reviewed the entirety of the discovery. *See United States v. Walton*, No. 5:10-CR-78-JMH-EBA, 2014 WL 2004472, at *10-*11 (E.D. Ky. May 15, 2014) (rejecting a failure to provide discovery *Strickland* claim); *Smith v. Warden, Warren Corr. Inst.*, No.

[4] Regarding Watson, Judge Smith first noted "Defendant's oral motion for discovery" in his Initial Appearance and Arraignment Minutes. DE #529.

1:11-CV-83, 2012 WL 668608, at *2 (S.D. Ohio Feb. 29, 2012). Watson "does not indicate when he requested the discovery, how often he requested it, what the discovery materials contain, or why they would have influenced his decision to plead guilty." *United States v. Stewart*, No. 08-124-ART, 2011 WL 382206, at *3 (E.D. Ky. Jan. 4, 2011), *adopted in* 2011 WL 381951 (E.D. Ky. Feb. 2, 2011). As to this parallel analysis, the *Stewart* Court continued:

> The Court can find no authority suggesting that an attorney renders constitutionally ineffective assistance by failing to share discovery materials with the defendant. As a general matter, there is no constitutional duty for an attorney to share discovery documents with the defendant. *Carillo v. United States*, 995 F. Supp. 587, 591 (D.V.I. 1998). Although [Movant] did have the right to meaningfully participate in making decisions fundamental to his defense, he has failed to show that actual access to discovery documents was fundamental to his decision to plead guilty. *See White v. Cason*, No 04–CV–75071, 2006 WL 763194, at *11 (E.D. Mich. Mar. 24, 2006). While there might be a scenario where an attorney's failure to provide discovery documents violates his client's Sixth Amendment rights, [Movant]'s allegations do not raise such a claim. Other courts addressing this issue have similarly found that an attorney's failure to share discovery materials with his client does not amount to ineffective assistance of counsel. *See e.g.*, *White*, 2006 WL 763194 at *11; *Gaughan v. United States*, No. 2:02–CV–169, 2006 WL 2798155, at *13 (N.D. Ind. Sept. 28, 2006); *Ramsden v. Warden, Dep't of Corr.*, No. 02–138, 2003 WL 356031, at *10 (D. Me. Feb. 14, 2003).

*Stewart*, 2011 WL 382206, at *4 (citations altered). This Court agrees with the underpinning of the above analysis. As other courts have noted, Watson here "cites no authority indicating that counsel had a duty to provide [him] with access to or copies of discovery materials. Every authority the court could locate suggests the opposite." *Gaughan*, 2006 WL 2798155, at *13. In pleading guilty here, Watson fully and unequivocally admitted his role in the conspiracy (as the Court will detail later). He does not proffer what the discovery he allegedly did not see or cover with counsel contained that would have led him to maintain his innocence and go to trial. He does not proffer

what complete or partial defenses reviewing all discovery would have unveiled or supported. The Court could not possibly critique the lawyer or determine a valid plea effect with no evidence of what the alleged discovery contained.

Further, Mr. Abell, an officer of the Court, verified that "[t]he assertion that the other discovery materials [not subject to the protective order] were not reviewed adequately with Mr. Watson is false and incorrect. The vast majority of the 13.6 hours of face-to-face conferences with Mr. Watson prior to entry of his guilty plea were devoted not just to reviewing these materials but to discussing their significance and value as proof to the government." DE #1331-1, at 12-13. Watson himself described Mr. Abell's effort to provide him with further direct discovery access: "Mr. Abell brought up the fact that I [Watson] wasn't being allowed to see [the] discovery[, and Judge Smith] said she would send over a letter that would inform the jail to allow me [Watson] to see my case." DE #1283-1, at 3. At rearraignment, Watson confirmed to Judge Thapar, under oath, that he discussed the case with Mr. Abell, told Mr. Abell everything he knew about the case, reviewed the Indictment, discussed all counts with Mr. Abell, discussed possible defenses, discussed with Mr. Abell everything necessary to enter a knowing and voluntary plea, and discussed the maximum possible penalties. DE #1318, at 15-17. Watson explicitly affirmed that he was "satisfied with [Mr. Abell]'s advice and representation." *Id.* at 17. Watson's ineffective assistance claim regarding discovery access is wholly without merit.[5]

---

[5] Watson advances a new theory in his reply: that Mr. Abell was ineffective for failing to ensure that the Court instituted the protective orders with good cause. *See* DE #1372, at 4, 6. This was improper procedurally. "[A]rguments made . . . for the first time in a reply brief are waived." *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010). Regardless, Watson cites no facts supporting his baseless assertion; the Court found good cause for the protective orders. *See* DE ##239, at 1 ("The motion establishes good cause for a

To the extent Watson tries to argue that counsel's actions "violat[ed] due process[,]" DE #1283, at 5, this argument similarly fails. First, except for ineffective assistance claims, he waived the right to collaterally attack the guilty plea, conviction, and sentence. DE #756, at ¶ 7. Watson did not challenge the validity of the waiver or his underlying plea. In these circumstances, the Court enforces the waiver. *In re Acosta*, 480 F.3d 421, 422-23 (6th Cir. 2007). The waiver is an independent reason to deny relief. Alternatively, the claim is meritless. "There is no general constitutional right to discovery in a criminal case[.]" *Weatherford v. Bursey*, 97 S. Ct. 837, 846 (1977). "[T]he Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded." *Wardius v. Oregon*, 93 S. Ct. 2208, 2212 (1973). Watson makes no claim that the discovery mechanisms in place in this case, and implemented per Rule 16(d), denied him a fundamentally fair procedure or failed to comply with any applicable law. In fact, he admitted to his conduct and pleaded guilty, and the discovery—even those materials subject to a protective order—was fully available to him on three Court-provided laptops at the detention center. *See* DE #475. All discovery was accessible to the defense (and Defendant personally) in some form. The record indicates, contrary to Watson's current assertions, that he was able to consult with and aid Mr. Abell in his own defense over the course of several meetings.[6] Of course, he subsequently admitted his

---

protective order."); 302, at 1 ("Review of the Government's Second Motion reveals that it establishes good cause for the issuance of a protective order as to these additional documents."). The effect of the orders simply was to regulate the manner of discovery access. The Court rejects any claim premised on criticism of counsel and Rule 16(d) mechanics.

[6] The only cases Watson cites on this discrete topic implicate due process concerns regarding visible physical restraints at trial, which Watson obviously did not face. *See United States v. Perry*, 401 F. App'x 56, 63 (6th Cir. 2010); *United States v. Waagner*, 104 F. App'x 521, 526 (6th Cir. 2001).

guilt. Watson does not offer a true due process theory; the undeveloped claim merits no habeas relief.

2. Failing to Investigate

Watson next argues that Mr. Abell ineffectively "[d]id not investigate Watson's protestations of innocence, or the viability of the affirmative defenses of Watson's actual medical condition as a rationale for Watson obtaining some of the medications, if not all of them." DE #1327, at 7; *see also* DE #1283, at 8.

Certainly, "[c]ounsel cannot blunder into court without having performed basic research and preparation." *Howard v. United States*, 743 F.3d 459, 468 (6th Cir. 2014). "That said, . . . counsel cannot be expected to present every argument suggested by a defendant-client, knowing that at least some are futile." *Id.* (rejecting Howard's ineffective assistance claim); *see also Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000) ("[J]ustice requires that counsel must do more than appear in court[.]"). "Reasonableness of the attorney's investigation is an objective determination of whether the investigation was reasonable given the prevailing professional norms, and the context of the investigation as seen from counsel's perspective at the time." *United States v. Tompkins*, No. 10-CR-20582, 2013 WL 5728794, at *4 (E.D. Mich. Oct. 22, 2013) (citing *Wiggins v. Smith*, 123 S. Ct. 2527, 2536 (2003)); *see also Strickland*, 104 S. Ct. at 2066 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

Watson signed the plea agreement, in which he admitted (and stated that the United States could prove beyond a reasonable doubt) that he "conspired to distribute oxycodone" and admitted to the surrounding facts, including traveling to a pain clinic(s),

filing prescriptions, and transferring the pills to other conspiracy participants. DE #756, at ¶ 3(a)-(d). Watson further verified that he "told [his] attorney everything [he] kn[e]w about the case[.]" DE #1318 (Rearraignment Transcript), at 15. He stated he reviewed the indictment. *Id.* Mr. Bracke, the AUSA, summarized Watson's involvement in the conspiracy. *Id.* at 53-55. The following exchange occurred:

> Mr. Bracke: "Mr. Watson's primary involvement, he joined on or about June 24th, 2011 and continued through the conspiracy, February 21st, 2013. He was primarily a traveler for the group. . . . He went to at least one [pain clinic]. He obtained prescriptions as part of a group of four people in which each person got at least 100 Oxycodone 30-milligram tablets, and they, in turn, were given a prescription of pills, and the Oxycodone was transferred to other members of the group to be distributed. Mr. Watson directed, participated, in at least seven successful trips. Based upon that, we agree that he's responsible for approximately 2,800 Oxycodone 30-milligram tablets that were reasonably foreseeable to him that were distributed by the group, based upon his involvement."
>
> The Court: **So Mr. Watson, between June 24th, 2011 and February 21st, 2013, you knowingly and voluntarily joined a conspiracy to distribute Oxycodone?**
>
> Defendant Watson: **Yes, sir.**
>
> The Court: And you knew the Oxycodone was going to be distributed in the Eastern District of Kentucky and elsewhere?
>
> Defendant Watson: Yes, sir.
>
> The Court: And your role in the conspiracy was to travel to pain clinics, obtain Oxycodone illegally, and then supply it to the conspiracy to be distributed?
>
> Defendant Watson: Yes, sir.
>
> The Court: And you supplied at least a portion of the Oxycodone to the conspiracy?
>
> Defendant Watson: Yes.
>
> The Court: And at the time you did, you knew it was going to be distributed?

> Defendant Watson: Yes, sir.
>
> The Court: And so you went on seven trips to a pain clinic or pain clinics to obtain Oxycodone; and in doing so, it was reasonably foreseeable to you that the conspiracy would obtain at least 2,800 Oxycodone 30-milligram tablets?
>
> Defendant Watson: Yes, sir.

*Id.* at 54-55 (one paragraph break removed; emphasis added). In this exchange, Watson clearly and unequivocally admitted his role in the subject Oxycodone conspiracy. A defendant's statements in a plea colloquy carry a strong presumption of veracity, which Watson here makes no effort to overcome. *Blackledge v. Allison*, 97 S. Ct. 1621, 1629 (1977). Judge Thapar asked Watson how he pleaded. DE #1318, at 62. Watson responded: "Guilty." *Id.* He thus conceded his criminal conduct in open court. He admitted that his decision to plead guilty was free and voluntary. *Id.* at 48.

Watson did not claim innocence under oath or in open court. He fully and plainly admitted his role as an Oxycodone conspiracy traveler. Watson is critical of counsel, but he offers no evidence or other specifics of what Mr. Abell should have investigated or presented to the Court. Watson's reference to unspecified medical evidence "as a rationale for Watson obtaining some of the medications, if not all of them" sets forth no particular proof and does not touch on his admitted criminal conduct. Mr. Abell stated that he and Watson "discussed on June 20, 2013, Mr. Watson's medical treatment at two facilities[.]" DE #1331-1, at 8-9. Watson signed a medical release form, and Mr. Abell wrote the facilities the next day. *Id.* at 9. Counsel received records from Tower House to use to establish that "at least part of Mr. Watson's motivation for participating was to obtain pain relief for legitimate and documented physical problems." *Id.* Mr. Abell did

what he reasonably could, including requesting and obtaining medical records and filing a sentencing memorandum where he identified "a number of compelling and mitigating circumstances" that he claimed supported a lower sentence for Watson. *See* DE #966. Watson further makes an oblique suggestion that "pill quantity could have been mitigated at sentencing." DE #1327, at 8. However, he offers no evidence to support this bald assertion. In any event, Mr. Abell's actions as counsel, based in part on Watson's medical history and pill retention, *did* result in a reduction in pill count. *See* DE #1331-1, at 10 ("[T]he government did subsequently change the proposed plea terms, cutting in half the number of oxycodone pills[.]"). Viewing the record as a whole, Mr. Abell provided competent representation to Watson. The claim warrants no § 2255 relief.[7]

3. Failing to Discuss the Terms of Supervised Release

Watson next argues that counsel "[d]id not, ever, discuss the terms of supervised release" and was thereby ineffective. DE #1327, at 7. Watson provides no further elaboration, and the conclusory argument cannot succeed.[8]

Watson had numerous opportunities to learn of supervised release pre-sentencing. From the beginning of the case, the Indictment's penalty sheet listed supervised release as a potential penalty. DE #364, at 13 (listing "at least 3 years supervised release" and no maximum term as part of the punishment for Count I). Mr. Abell verified that he discussed, in general terms, supervised release with Defendant. DE #1331-1, at 14.

[7] It was Abell's argument that saved Watson at sentencing when Judge Thapar wrestled with the justification for a final offense level. DE #1319, at 27 (citing key role of "what Mr. Abell said").

[8] Watson's real concern appears to be that counsel did not tell him that he would get 10 years of supervised release. DE #1372, at 9. (He fails to mention, however, that he can petition for termination after 5 successful years.) Watson knew that he faced up to a lifetime of supervised release, and regardless, counsel could not know pre-sentencing what term of supervised release Judge Thapar would actually impose.

Defendant signed the plea agreement, which articulates a term of "at least 3 years supervised release." DE #756, at ¶ 4. The Court discussed supervised release, including the maximum, at rearraignment (conducted jointly with that of co-Defendants Bales and John Helton), and Defendant verified he understood. Watson stated he "discussed the maximum possible penalty that might be imposed in [his] case with [his] attorney[.]" DE #1318, at 16-17. The Court explicitly discussed supervised release in great detail with Watson. Judge Thapar stated, "I want to talk to you all about supervised release. . . . Mr. Watson, the term of supervised release you face is not less than three years and not more than life on supervision." *Id.* at 19. "During supervision, as I mentioned, all of you will be placed on conditions stricter than society in general." *Id.* at 21. Judge Thapar asked co-Defendant Bales if he knew the consequences of violations. Bales confirmed that he knew he could be imprisoned, and the Court stated that additionally it could subsequently impose a further term of supervision. "Mr. Watson," the Court stated, "I could do the same to you." *Id.* The Court explained the proof burden in revocation proceedings. *Id.* Watson confirmed his comprehension: "I do understand, sir." *Id.* at 22. Judge Thapar reiterated: "Mr. Watson, do you understand if you violate the terms of supervised release, it can become like a revolving door, and you can back to prison and then come out and be on supervised release again?" *Id.* Watson again stated, "Yes, I understand." *Id.* The Court gave Watson the opportunity to ask "any questions about the process of supervised release[,]" but Watson declined. *Id.*

Watson heard repeatedly about and had plenteous opportunities to learn of the mandated term of supervised release as a consequence of his actions. He professed that he understood that he faced a minimum of three years and a maximum of life on

supervised release following imprisonment. He acknowledged that "the paper that [he] got . . . said . . . 3 years supervised release[.]" DE #1283-1, at 12. At sentencing, after Judge Thapar announced the term of supervision, Watson did not raise surprise or question the outcome. DE #1319 (Sentencing Transcript), at 27-30. He confirmed he understood the term and the conditions imposed. *Id.* at 30. The record thoroughly contradicts his current contrary claims. Under the ineffective assistance rubric, Watson satisfies neither *Strickland* prong; he does not establish that, in context, where Watson was repeatedly informed of supervised release, counsel deficiently performed, and Watson wholly fails to establish prejudice when case documents and the Court informed him, recurrently, of the possibility of life on—and indeed, the minimum 3-year mandatory term of—supervised release.

4. Making Minimal Efforts to Ameliorate Watson's Custodial Environment

Watson next argues that counsel was ineffective because he "[m]ade minimal efforts to ameliorate the coercive environment in which Watson was placed." DE #1327, at 7. Again, Watson provides no further elaboration of the claim. Later he claims that "his plea was, at root, the product of his coercive environment." DE #1372, at 10.

Counsel stated that after encountering his client with a black eye in the Campbell County Detention Center, he discussed confinement conditions with Watson, "discussed with him whether he felt safe, and explained that I [Mr. Abell] could and would, if necessary, take the issue up with the [C]ourt and try to have him moved to a different facility." DE #1331-1, at 13. Watson replied "to the effect that he was not concerned about any continuing problem or issues." *Id.* Watson's current assertion to the contrary is unsubstantiated and conclusory. Watson proffers no specific actions that counsel should

have taken but failed to take. Movant offers no details of the amelioration that counsel could or should have performed. The conditions of Watson's confinement, regardless, are wholly tangential to the substantive criminal charge against him, to which he unambiguously and freely admitted guilt. The record suggests that Mr. Abell inquired into confinement conditions and specifically offered to take action, but Watson refused. Even if counsel failed to take any action (which, on this record, he plainly did not), Watson utterly fails to establish prejudice. Watson has not shown a likelihood that the result of his case would have been different if counsel had made unspecified efforts to mitigate his custodial conditions.[9] Watson admitted under oath that his "decision to plead guilty [was his] own free and voluntary act[.]" DE #1318, at 48. He stated that no one subjected him to "any threats or force of any kind which cause[d him] to plead guilty[.]" *Id.* The claim warrants no relief.

5. Rushing to Plead

Watson next argues that counsel was ineffective because he "[r]ushed to plea[d.]" DE #1327, at 7. Movant again merely makes this statement in passing, without further

[9] Again, Watson claims that his plea itself was the product of his custodial environment. DE #1372, at 10; *see also* DE #1283-1, at 9 ("The state I was in I was ready to give up my innocence just to get out of this jail[.]"). He fails to identify any action Mr. Abell should have taken, and his guilt admission belies his present, unsubstantiated proffer of plea justification. *See McDonald v. Burke*, 149 F.3d 1183, at *6-*7 (6th Cir. 1998) (table) ("McDonald simply cannot overcome the answers he gave in the admirably detailed colloquy conducted by Judge Cahalan. . . . [I]t is clear that McDonald felt only the inescapable pressures of the realities of his situation, not unconstitutional coercion. Given the type of coercion that McDonald alleges, there is no reason why he should not have felt free to express his concerns to the court; this is not a situation where someone has alleged to make promises or threats to extort silence. Pressures are inevitable in the guilty-plea context, but they do not automatically form the basis for a collateral attack."). Never does Watson allege that he would have, in fact, rejected the plea agreement, pleaded not guilty, and gone to trial if Mr. Abell had made unspecified efforts (perhaps even unsuccessfully) to, in some unknown way, ameliorate Watsons's custodial environment. Indeed, Watson admits that Mr. Abell "[m]ade minimal efforts" in this regard, and these actions did not change his plea decision.

elaboration. It, likewise, wholly fails. The pre-plea portion of the case lasted from May 23, 2013 (date of initial appearance) to July 18, 2013 (date of rearraignment). This fifty-six day period is hardly "rushing to plead." In the interim, the Court conducted a detention hearing and a status conference. *See* DE ##550 (Detention Hearing Minutes); 565 (Status Conference Minutes). This period is harmonious with the Speedy Trial Act's general requirement that a criminal trial begin no earlier than 30 days and no later than 70 days from the date the defendant appears before a judicial officer. 18 U.S.C. §§ 3161(c)(1)-(2). Additionally, at rearraignment, the following exchange occurred:

> The Court: Okay. Mr. Watson, you received four different plea agreements. Did you review each of them with Mr. Abell?
>
> Mr. Watson: Yes, I did, sir.
>
> The Court: And do you agree with the government's assessment that you're signing the most favorable one?
>
> Mr. Watson: Yes, sir.
>
> The Court: And Mr. Abell, did you have oral or e-mail communication with Mr. Bracke?
>
> Mr. Abell: Both, Your Honor.
>
> The Court: And did you share them with Mr. Watson?
>
> Mr. Abell: I did, Your Honor.
>
> The Court: And Mr. Watson, is that accurate; that you had discussions with your counsel, Mr. Abell, about all your plea offers and the discussions?
>
> Mr. Watson: Yes, sir.
>
> The Court: And Mr. Abell, do you concur that this is the most favorable plea agreement for Mr. Watson?
>
> Mr. Abell: I do, Your Honor.

DE #1318, at 38-39. Discussions among the prosecutor, defense attorney, and Watson concerning four iterations of a proposed plea agreement indicate strongly that Watson's decision to plead guilty was not, in any way, unconstitutionally rushed. Instead, it appears carefully considered; Mr. Abell, likewise, appears to have advocated diligently for a more defense-friendly plea, likely lessening Watson's ultimate sentence and benefitting Defendant's case outcome. Mr. Abell stated that he "had not solicited" the initial proposed plea "but, of course, provided it to Mr. Watson[,]" and Mr. Abell ultimately advised Watson "to reject the plea offer[] because the terms offered little and could be improved, as they [in fact] were." DE #1331-1, at 7-8. Mr. Abell continued to negotiate plea terms, fighting for Watson and obtaining beneficial concessions from the United States and changes to the eventual agreement. *See id.* at 9-12 (narrating the process). Watson further states that Mr. Abell advised him to reject a subsequent plea offer. DE #1283-1, at ¶ 34. Watson satisfies neither *Strickland* prong; he does not establish that Mr. Abell deficiently performed in any way or that he suffered resultant prejudice. Watson justifies no § 2255 relief premised on a *Strickland* violation. Counsel promptly communicated and was an active advocate in the plea process, one Watson volitionally endorsed.

6. Failing to Challenge the Restitution Order

Watson argues that counsel ineffectively "[d]id not challenge the $1.8 million dollar [sic] restitution order[.]" DE #1327, at 7. Again, he offers no further elaboration of this theory. He does not cite where the alleged restitution order appears. Restitution in his case, per the Judgment, was "[n]ot [a]pplicable[.]" DE #998 (Judgment), at 5. The Final Decree and Order of Forfeiture—if Watson intended to refer to that document—does not

mention Watson by name, and none of the property at issue therein belonged to him. *See* DE #1143. The Indictment's forfeiture allegation contains a $1,825,510.00 aggregate gross proceeds money judgment "for which the Defendants are jointly and severally liable[.]" DE #364, at 9. Watson stated in his Declaration that "[w]hen [he] got to FCI Elkton[, his] case worker *tried* making [him] sign a paper that said [he] owed jointly and sever[al]ly with everyone on [his] case around 1.8 million dollars." DE #1283-1, at 13 (italics added). Watson does not identify this alleged document, attach it to his pleadings, or state that he actually signed it.

The Court surmises that Watson, in this argument, is objecting to the money judgment figure in the Indictment because restitution was inapplicable. He provides no basis on which to challenge the forfeiture allegation, only cursorily, and without factual or legal support, asserting that "it was assailable." DE #1327, at 7. However, by signing the plea agreement, Watson agreed to "forfeit to the United States all interest in the property listed in the forfeiture allegation of the Indictment[,]" which included reference to the approximately $1.8 million proceeds-based money judgment. *See* DE #756, at ¶ 8. Watson confirmed at rearraignment that the agreement on forfeiture was fair and accurate. DE #1318, at 43-44. Judge Thapar explicitly reiterated, "Mr. Watson, . . . you . . . understand that any forfeiture that's applicable will occur in accordance with your plea agreement?" "Yes, sir." "And do you have any questions about the forfeiture portion of this?" "No, sir." *Id.* at 44. The Judgment requires Watson to "forfeit [his] interest in . . . [a]ll items listed in the forfeiture allegation[.]" DE #998, at 6. With no Movant elaboration and no stated basis for the claim of ineffective assistance, Watson's *Strickland* claim is clearly without merit. He identifies no ground on which Mr. Abell

should have challenged an alleged restitution order (or forfeiture to which Watson agreed to be bound) or, in any event, how the challenge (when he admitted the forfeiture amount was proper) would have resulted in a different case outcome.

7. Failing to Raise Affirmative Defenses

Watson argues that counsel was ineffective by failing to raise affirmative defenses. DE #1327, at 10-11; *see also* DE #1283, at 7. The failure to investigate and raise a viable affirmative defense can constitute ineffective assistance. *See, e.g.*, *Foster v. Wolfenbarger*, 687 F.3d 702, 708 (6th Cir. 2012) (failure to investigate alibi defense). Watson does not, however, specifically identify or substantiate any viable affirmative defenses that Mr. Abell should have argued. Watson does state that he "was not associated with any of the persons on his conspiracy"[10] and that he had his "own medical issues[.]" *Id.* at 10.

His admission of guilt belies the current arguments.[11] Watson fully admitted to participating in the conspiracy. Watson verified that he "discussed any possible defenses

[10] This appears to be an attempt at an innocence defense. Mr. Abell stated that "Watson did indicate . . . that he did not know, was not familiar with[,] and/or had never heard of *a number of* his 39 co-defendants." DE #1331-1, at 4 (italics added); *see also* DE #1283-1, at ¶ 3 ("I knew very few people on the case[.]"). Indeed, in his reply, Watson admits, "It is not a legal impossibility that a conspiracy can occur with unknown (to each other) conspirators[.]" DE #1372, at 8. As Mr. Abell noted to Watson, "[t]he existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir. 2014) (quoting *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005)). "[I]n a drug chain conspiracy, it is enough that each member of the conspiracy realizes that he is participating in a joint enterprise, **even if he does not know the identities of many of the participants**." *United States v. Maliszewski*, 161 F.3d 992, 1014 (6th Cir. 1998) (internal quotation marks, alteration, and citation omitted; boldface added).

[11] *Cf. United States v. Cronic*, 104 S. Ct. 2039, 2045 n.19 (1984) ("[I]f the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt. And, of course, even when there is a bona fide defense, counsel may still advise his client to plead guilty if that advice falls within the range of reasonable

that [he] may have to the crimes alleged with [his] attorney." DE #1318, at 15-16. Watson's proffer of his "own medical issues" changes nothing regarding his admission of "travel[ing] to pain clinics, obtain[ing] Oxycodone illegally, and then supply[ing] it to the conspiracy to be distributed." DE #1318, at 54-55. Similarly, Watson may now deny knowing other conspiracy participants, but he admitted to "knowingly and voluntarily join[ing] a conspiracy to distribute Oxycodone" and "suppl[ying] at least a portion of the Oxycodone to the conspiracy[.]" *Id.* Mr. Abell stated that "Mr. Watson acknowledged that he was invited by co-defendant Jay Young to participate in the conspiracy and that he participated willingly and knowingly." DE #1331-1, at 3. The case agent, Brad Ramey, confirmed Watson's connection with and knowledge of Young at Watson's detention hearing. *Id.* A wiretap recorded Young and the conspiracy principal, Damon Helton, referring to Watson and his participation in the conspiracy. *Id.* at 7.[12] Watson's visits to the Broward Pain Clinic correlated, at times, with visits of at least 8 other co-defendants. *Id.* at 9. Movant provides no factual basis for his alleged affirmative defenses, and the record squarely contradicts his present claims. On this record, Watson has not demonstrated that Mr. Abell deficiently performed, and, regardless, Watson has not sufficiently demonstrated resulting prejudice when his generally stated affirmative defenses find no support in case (or proffered) evidence and would not negate his admitted conduct. Counsel verified that he and Watson "discussed at length what evidence could the government produce that would link Mr. Watson to others charged in

competence under the circumstances."). There obviously was no breakdown of the adversarial process here; facing robust conspiracy proof, Mr. Abell effectively negotiated with the United States and achieved benefits for Watson. Watson then freely chose to plead guilty. *See* DE #1318, at 48.

[12] Watson acknowledged the existence of a transcript of this conversation. DE #1283-1, at ¶ 27.

the indictment[.]" *Id.* at 4. Mr. Abell achieved a pill amount reduction in the ultimate plea based in part on Watson's medical evidence theory, of doubtless benefit to Watson. *See id.* at 10. Movant even argues that his legitimate need was only as to "some" of the pills. DE #1327, at 12. The claim fails.

8. Failing to Raise an Innocence Defense

Watson finally argues that counsel was ineffective for not raising an innocence defense. DE #1327, at 12. The argument that Mr. Abell should have presented an innocence theory, regarding actions to which Defendant admitted guilt, is wholly baseless. Mr. Abell verified that Watson "[n]ever . . . suggest[ed], hint[ed,] or claim[ed] that he was innocent with regard to the charge in this case against him." DE #1331-1, at 3. Indeed, Watson stated under oath:

> The Court: So Mr. Watson, between June 24th, 2011 and February 21st, 2013, you knowingly and voluntarily joined a conspiracy to distribute Oxycodone?
>
> Defendant Watson: Yes, sir.

DE #1318, at 54. Soon thereafter, Watson pleaded guilty. *Id.* at 62.

Watson makes two specific claims. First, he states that he "did not conspire with any persons." DE #1327, at 12. Of course, Watson's admissions in open court during rearraignment refute this. He offers no specific evidence to contradict his earlier admission. *See Vanwinkle v. United States*, 645 F.3d 365, 370 (6th Cir. 2011) (A "plea serves as an admission that [Defendant] is not innocent of the crimes charged." (internal quotation marks and citation omitted)). Second, he states he "had a legitimate need and use for at least some of the medications." *Id.* This statement—only proffering a need (notably, not a valid prescription or legitimate entitlement) for *some of* the medications—

wholly fails to carry the *Strickland* burden (and even, if accurate, does not explain obtaining medications to which he did not have a legitimate prescription, as well as his admitted distribution actions). Watson offers no evidence to make a showing of actual innocence, and his clearly baseless *Strickland* claim—where Defendant admitted his guilt to the Court under oath—plainly fails both prongs.

*B. Evidentiary Hearing*

Watson additionally argues that "fact development should ensue," which the Court construes as a request for an evidentiary hearing. DE #1327, at 5; *see also* DE #1372 (Reply), at 4, 5, 7, 9, 10, 11 (directly requesting an evidentiary hearing). The Court must hold an evidentiary hearing unless "the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Further, no hearing is necessary "where the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Huff v. United States*, 734 F.3d 600, 607 (6th Cir. 2013) (quoting *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)) (internal quotation marks removed). None of Watson's claims warrants a hearing; despite the asserted narrative and fact differences between Movant and counsel, the § 2255 motion filings and record of the case conclusively show, for the reasons stated above, that Watson's claims fail.[13] Watson's claims are all "threadbare[,]" made "in the vaguest of terms[,]" and do not entitle him to an evidentiary hearing. *Stewart*, 2011 WL 381951, at *2. There are no

[13] Watson cites *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999), for the proposition that the burden to establish entitlement to an evidentiary hearing is "relatively light." DE #1372, at 5. He ignores the decision's next sentence: "However, it would be nonsensical to conclude that the petitioner could meet that burden simply by proclaiming his innocence." *Turner*, 183 F.3d at 477. All Watson presents to the Court are conclusory allegations and self-serving proclamations—no other proof. The burden is Watson's, and he fails to meet it on any factual matters of consequence.

contested factual issues that, in the context of the required *Strickland* rubric, justify a hearing. The record, which needs no further development, forecloses relief.

## IV. CERTIFICATE OF APPEALABILITY

A Certificate of Appealability may issue where a movant has made a "substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). This standard requires a movant to demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 120 S. Ct. 1595, 1604 (2000); *see also Miller-El v. Cockrell*, 123 S. Ct. 1029, 1039-40 (2003) (discussing development of standard). The reviewing court must indicate which specific issues satisfy the "substantial showing" requirement. *See* 28 U.S.C. § 2253(c)(3); *Bradley v. Birkett*, 156 F. App'x 771, 774 (6th Cir. 2005) (noting requirement of "individualized assessment of . . . claims") (citing *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001)). For dismissal on procedural grounds, as to when a Certificate of Appealability should issue, the movant must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 120 S. Ct. at 1604. Movant has not made a "substantial showing" as to any claimed denial of rights; his *Strickland* claims (and possible due process claim) conclusively fail. Reasonable jurists would not find the Court's determination on the merits debatable. Accordingly, the Court recommends that the District Court entirely deny a Certificate of Appealability.

## V. RECOMMENDATION

For the reasons discussed above, the Court **RECOMMENDS** that the District Judge wholly **DENY** § 2255 relief (DE #1283) and issue **NO** Certificate of Appealability.

* * * * *

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights and mechanics concerning this Recommended Disposition, issued under subsection (B) of the statute. *See also* Rule 8(b), Rules Governing Section 2255 Proceedings for the United States District Courts. Within fourteen days after being served with a copy of this decision, any party may serve and file specific written objections to any or all findings or recommendations for determination, *de novo*, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and usually does, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 106 S. Ct. 466, 475 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

This the 29th day of October, 2015.

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF KENTUCKY

**Signed By:**
***Robert E. Wier*** REW
**United States Magistrate Judge**